# IN THE COURT OF APPEALS OF IOWA

No. 17-0678
Filed November 7, 2018

IN RE THE MARRIAGE OF STEPHEN D. AGAN
AND JULIANNE M. AGAN

Upon the Petition of
STEPHEN D. AGAN,
　　　　Petitioner-Appellant/Cross-Appellee,

And Concerning
JULIANNE M. AGAN,
　　　　Respondent-Appellee/Cross-Appellant.
_____

　　　　Appeal from the Iowa District Court for Madison County, Richard B. Clogg,

Judge.

　　　　Stephen Agan appeals and Julianne Agan cross-appeals from various

provisions of the decree dissolving their marriage. **AFFIRMED AS MODIFIED.**

　　　　Ryan D. Babich and Phillip F. Van Liew of Babich Goldman, PC, Des

Moines, for appellant.

　　　　Elisabeth S. Reynoldson of Reynoldson & Van Werden, LLP, Osceola, and

Jane E. Rosien of Flander Rosien, PC, Winterset, for appellee.

　　　　Heard by Danilson, C.J., Doyle, J., and Scott, S.J.*

　　　　*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2018).

**DANILSON, Chief Judge.**

Stephen (Steve) Agan appeals and Julianne (Juli) Agan cross-appeals from various provisions of the decree dissolving their marriage. Steve argues the dissolution court inequitably valued and divided the marital property. Juli argues the court erred in valuing the pastureland. Neither party challenges the distribution of property, rather both raise various issues to support their contention that the equalization award was inequitable. Steve also requests appellate attorney fees.

Upon our de novo review of the decree, we modify the dissolution decree to account for various gifted monies and conclude the equalization payment to Juli from Steve shall be in the amount of $80,000. We do not award appellate attorney fees.

## I. Background Facts & Proceedings.

Steve and Juli began living together in February 2009, and were married on February 27, 2010. On March 3, 2015, Steve filed a petition for dissolution of marriage. In June 2015, Juli moved out of the home where the parties had resided together. The trial was held on November 16-17, 2016, and the decree was filed on February 27, 2017.

Steve works as a heavy equipment operator with Elder Corporation. Juli works at Wells Fargo. Steve receives unemployment compensation during his company's annual layoff. In addition to his job, Steve raises cattle and serves as manager of his family's trust, the Raymond John Agan Trust. As compensation for his work as manager, Steve is permitted to live in the home owned by the Trust and to use the adjoining farm buildings and graze the 100 acres of adjoining

pasture land. He is not required to pay any rent for the house, buildings, or pasture land.

Steve's grandfather gave him five cows in 2000 and fifteen cows in 2001. Steve purchased a bull before he and Juli were married. At the time of the parties' 2010 marriage, Steve owned twenty-five cows, one bull, and ten to thirteen calves. One cow and two bulls were purchased during the marriage. Juli took time off work to assist the veterinarian in working the herd. She was involved in the calving season, contacting the veterinarian when needed, pulling calves, and bottle feeding. Both Juli and Steve were involved in the bookkeeping necessitated by the cattle operation.

During their marriage, Steve and Juli combined their bank accounts. They both deposited their paychecks into a joint account at Farmer and Merchants State Bank, which was used both as their personal account and as the farm account to fund the cattle operation. Juli also deposited the child support she received for her two children from a prior marriage into this account. The parties also had joint checking and savings accounts at Union State Bank.

In March 2012, Steve and Juli purchased 36.74 acres of pasture in Madison County. The funds for the purchase of the real estate ($89,058) came from Steve's mother, Mildred Jo Agan ("Jo"). The instrument of conveyance executed when the real estate was purchased vested title in Steve and Juli as "Joint Tenants with Full Rights of Survivorship and Not as Tenants in Common."

During the marriage, Steve and Juli paid for and made substantial improvements to the pasture land, reconstructing the pond on the land, installing a fence around the pond, installing an additional stretch of fence, installing tile and

waterers, building a small corral, and building a crossing. All of these improvements were paid for out of the parties' joint bank account at Farmers and Merchants State Bank. Until late 2014 when the parties separated, their bank accounts, real estate taxes, insurance premiums, and all other expenses related to the real estate were paid out of the parties' joint Farmers bank account.

Since June 2015, Steve has retained sole and exclusive possession of the real estate without regard to Juli's ownership interest. He received and retained all benefit, enjoyment and income generated from the real estate. Juli received no compensation or consideration in any form or amount.

By 2015, the cattle herd had grown to sixty-five cows. Steve sells his calves each year. After filing for divorce, Steve sold nine cows, one bull, and thirty-nine calves. He did not deposit the proceeds from these sales into any bank account, he retained over $38,000 cash.

On the date of trial—November 16, 2016—Steve was forty-five and Juli was forty-six years old, and both parties were in good health. They have no children together; Steve has no children and Juli has two children from a prior marriage. Steve's gross year-to-date income was $42,423, and he anticipated making another $1000 from Elder Corporation and about $6000 in unemployment compensation for the year. In addition, he benefits from the free rent and free use of buildings and pasture for supervising the properties owned by the trust. Juli's annual income was about $52,000.

At trial, Steve claimed the livestock were offspring from his premarital gifted livestock, with the exception of one cow and two bulls. He sought to have all but the one cow and two bulls set aside as gifted property. He also asserted that the

$89,058 his mother provided to purchase the thirty-six acres of farmland as pasture was a gift to him alone. Further, Steve contended in August 2012, his mother gifted to him alone $15,150 to purchase a hay rake and hay mower; on July 9, 2013, $16,660 to purchase a hay processer; and in July and August 2013, $11,000 to purchase a Kawasaki all-terrain vehicle (ATV) side-by-side. Steve's father also gifted him a boat in 2012 and a 1998 Dodge Dakota in 2013. Steve testified as to his estimate of the value of farm machinery, vehicles, and other property. He also testified the value of the pasture land was $2900 per acre.

Juli testified she had performed computer research of various sites she and Steve had used to purchase the various pieces of farm machinery, and she presented estimates from those websites as to the current value of the farm machinery and other items.[1] She also testified she had researched the sales of comparable properties to the pasture land purchased in 2012. She opined the value was $3800 per acre or $139,600.

Following trial, the district court made findings as to the value of contested property. The court found, "A fair and reasonable current fair market value of Steve and Juli's pasture land is $3200.00 to $3600.00 per acre for a total value of $125,000.00." The court also concluded the parties' assets included these items and determined their fair market values.[2]

> (a) Kuhn GMD 3550 Mower Conditioner (Serial #B0070) was purchased in approximately December 2011. Virtually the same piece of equipment, Kuhn GMD Mower Conditioner (Serial #B0098),

---

[1] Juli had sought and was granted leave to have the property appraised. However, the report by the appraiser was ruled untimely and was excluded from trial.

[2] We are unable to explain the different values set forth in the district court's findings of facts as compared to its conclusions of law, but we rely upon the values set forth in the district court's conclusions of law.

is for sale in Albia, Iowa for $12,900.00. The fair and reasonable value of the parties' mower conditioner is $8500.00.[3]

(b) Kuhn SR110 Hay Rake (Serial #E3929) was purchased in approximately December 2011. A similar but slightly older piece of equipment (Serial #E3571) is for sale in Waukon, Iowa for $4995.00. The rake for sale in Waukon is Serial #3571, produced approximately 400 units before production of E3929. The parties' hay rake has a kicker wheel, the one listed for sale does not, which increases value. The fair and reasonable value of the parties' hay rake is $3750.00.[4]

(c) Kewanee 1010 18' Disk was purchased in approximately June 2012. A similar piece of equipment is for sale in Ellsworth, Wisconsin for $4495.00. The fair and reasonable value of the parties' disk is $2200.00.

(d) Demco 500 gallon sprayer was purchased in approximately June 2012. S&H Farm Supply in Lockwood, Iowa, recently sold a similar sprayer for $500.00. The fair and reasonable value of the parties' sprayer is $500.00.[5]

(e) 2011 Kawasaki Mule 610 4x4 XC was purchased in approximately January 2011. A similar Mule, but without a roof and without a bumper/cattle guard, is listed for sale in Peninsula, Ohio, for $5998. A Kelley Blue Book valuation of a 2011 Kawasaki Mule 610 4x4 XC, also without a roof and bumper/cattle guard, is valued at $5245. The fair and reasonable value of the parties' Mule is $4250.00.[6]

(f) 2015 John Deere X534 Lawn Tractor (Serial #xxxFM101067) was purchased in March 2016. The parties' 2012 John Deere X534 Lawn Tractor, both purchased and paid for in full during the marriage, was traded in against the purchase of the 2015 Lawn Tractor. A trade allowance was given of $4200.00 for the 2012 Lawn Tractor. The parties' 2015 Lawn Tractor has only 40 hours of use, a 54" deck and a rack/cattle guard on the front. A 2015 John Deere X534 with only a 40" deck, 60 hours of use and no rack/cattle guard is for sale in Dubuque, Iowa for $6100. A 2015 X534 with a 54" deck and 86 hours of use, but no rack/cattle guard on the front, is for sale in Sleepy Eye, Minnesota for $6250.00. A fair and reasonable value of the parties' 2015 Lawn Tractor is $5300.00.[7]

(g) 1975 John Deere 4430 Tractor with Cab was purchased in January 2012. A slightly newer 1977 John Deere 4430 Tractor with Cab is for sale in Jordan, Minnesota for $12,900.00. A fair and

---

[3] Steve opined the Kuhn mower conditioner had a value of $5500; Juli valued it at $12,000.

[4] Steve valued the hay rake at $2500; Julie valued it at $5000.

[5] Steve valued the disk and sprayer at $1500; Juli valued the disk at $4410 and the sprayer at $500.

[6] Steve claimed the 2011 Kawasaki should not be considered marital property, which will be discussed further below.

[7] Steve valued the John Deere mower at $4500; Juli valued it at $6400 and claimed it was a gift to her.

reasonable value of the parties' 1975 John Deere 4430 is $9000.00.[8]

(h) 2013 12' Big Dog Feed Lot Box Scraper (Serial #H2120912800) was purchased in March 2013. The parties' scraper is in remarkably good or excellent condition. Two other 2013 12' Big Dog Feed Lot Box Scrapers are for sale in Iowa. One in Chariton; and, one in Manchester. Both are listed for sale for $4700.00. A fair and reasonable value of the parties' Big Dog Scraper is $3600.00.[9]

(i) 2013 727TK Grasshopper Mower with Powerfold Duramax 61" Deck (Serial #6314103) was purchased in March 2013. A 2001 720K/61 Grasshopper Mower owned by Steve prior to the marriage was traded in against the purchase of the 2013 Mower. A trade allowance was given of $2630.00 for this 2001 Grasshopper Mower. The parties' 2013 Grasshopper has approximately 140 hours of use. A 2013 Grasshopper 727T, without the Kohler cooled engine and with 244 hours of use is for sale in Sleepy Eye, Minnesota for $9650.00. A fair and reasonable value of the parties' 2013 Grasshopper 72TTK is $7500.00.[10]

(j) 2013 Highline CFR650 Bale Processor (Serial #CFR6505413) was purchased in July 2013. The same model but slightly older unit (Serial #CFR650402) is for sale in Osceola, Iowa for $17,500.00. The same model sold in Moorhead, Minnesota in April 2016 for $15,100.00. A fair and reasonable value of the parties' bale processor is $10,000.00.[11]

(k) 2012 Kawasaki Teryx KRF750NCS was purchased in August 2013. It has a roof, 1723 miles and 360 hours of use. A 2013 Kawasaki Teryx without a roof is for sale in Pound, Wisconsin for $6900.00. A fair and reasonable value of the parties' Teryx is $3800.00.[12]

(*l*) 2015 Suzuki King Quad 750 AXI was purchased in October 28, 2015. It has 15 miles and 3.4 hours of use, upgraded tires, upgraded wheels, a front rack and a back rack. A Kelley Blue Book valuation of a 2015 Suzuki King Quad, without any upward adjustment for the upgrades and accessories, is $7260.00. A fair and reasonable value of the parties' King Quad is $5200.00.[13]

(m) 2015 Wilson Ranch Hand 24' Aluminum Trailer (Serial #PSGN-5724T) was purchased in April 2015. A 2011 model of this

---

[8] Steve valued the John Deere tractor at $5000; Juli valued it at $11,600.

[9] Steve valued the scraper at $2500; Juli valued it at $4700.

[10] Steve testified the Grasshopper mower had replaced a mower he owned prior to marriage and claimed a value of $5000; Juli valued it at $10,100.

[11] Steve claimed the bale processor was a gift from his mother, valued at $8000; Juli valued it at $15,100.

[12] Steve claimed the 2012 Teryx was a gift from his mother and not running; Juli testified she was able to find a listing for a 2011 model, which sold for $4700, and a 2013 model, which was listed for $6900.

[13] Steve valued the King Quad at $3000; Juli valued it at $8260.

trailer with only one center gate is for sale in Harrisburg, South Dakota for $14,500.00. The parties' trailer has two center gates and is in very good condition. The 2011 model decreased in value $666.00 per year. A fair and reasonable value of the parties' Wilson Trailer is $14,800.00.[14]

(n) 2014 Ranchworx Aerator (Serial #56890314130RHA) was purchased in April 2014. This is a unique aerator. Comparable listings or sales are difficult to find. According to the manufacturer a comparable 2016 model would cost $22,700.00. A two-year-old model would decrease in value. A fair and reasonable value of the parties' aerator is $8000.00.[15]

(o) 259DS Caterpillar Multi Terrain Loader (Serial #FTL08580) was purchased in May 20, 2016. Two 259D Caterpillar Multi Terrain Loaders, one with 159 hours of use and one with 133 hours of use, are for sale on CatUsed.com for $56,500.00. Ziegler, Inc., the CAT dealership where the parties' loader was purchased, values it between $55,000.00 and $60,000.00. A fair and reasonable value of the parties' loader is $53,000.00.[16]

(p) Feeders, hay rings, waterers, portable fencing and miscellaneous hand tools and power tools were also purchased throughout the marriage. Steve and Juli, and now Steve individually, insure feeders for $5000.00, portable fencing for $8000.00 and miscellaneous hand tools and power tools for $13,450.00. The parties' income tax return depreciation schedules for the period of the marriage show the purchase of waterers totaling $1774.00; and, feeders totaling $680.00. Additionally, during 2015 Steve purchased a feeder for $2521.62 which was omitted from his 2015 depreciation schedule. Discounting these amount for items purchased prior to the marriage and for depreciation in value, a fair and reasonable fair market value of these items is $1000.00 for feeders, hay rings and waterers; $2000.00 for portable fencing; and, $1000.00 for miscellaneous hand and power tools.

In the February 27, 2017 dissolution decree, the district court characterized Steve's claims that the pastureland and farm machinery were gifts to him as an effort to "effectively deprive Juli of any interest or equitable consideration from those assets." The court did find there was credible evidence that monies were gifted to provide for the purchase of the pastureland. However, the court also

---

[14] Steve valued the Wilson trailer at $12,500; Juli valued it at $17,186.
[15] Steve valued the aerator at $4000, claiming it was damaged; Juli valued it at $16,800.
[16] Steve valued the loader at $50,000; Juli valued it at $56,500.

determined, "Even so, it is not clear those monies were gifted only to Steve and, even if they were, the gift has been sufficiently commingled to render it property subject to division in these proceedings."

The court also rejected Steve's claim that items were either in disrepair or damaged, decreasing their value. The court found no credible evidence supported reducing the fair market value of the 1975 John Deere 4430 Tractor, the 2012 Kawasaki Teryx, the 2015 Suzuki King Quad, or the 2014 Ranchworx Aerator.

The court also rejected Steve's claim that the monies used to purchase the 2012 Kawasaki Teryx, Kuhn SR110 Hay Rake, Kuhn GMD 3550 Mower Conditioner, and 2013 Highline CFR650 Bale Processor were from his mother and given exclusively to him. The court found:

> Steve and Juli's joint bank account records show cash deposits at or about the time of these items being purchased. Unlike the records admitted regarding the real estate purchase funded by Jo, there are no accompanying records of these cash deposits coming from Steve's mother. Steve testified that he did not like to have a lot of money in the bank and intentionally keeps large amounts of cash on hand at home. Juli corroborated this. It cannot be verified that the cash deposits made at or about the time these items were purchased were monies provided by Jo Agan, and not just cash Steve had on hand and deposited. Again, no gift tax returns were filed verifying the amounts of the gifts and/or the gift donee(s).
>
> Regardless, the monies were deposited into the joint checking account maintained by Steve and Juli at Farmers and Merchants State Bank. Steve and Juli together researched, shopped for and went to purchase these items. The insurance premiums for these items were paid out of the parties' joint account for so long as it existed. The cost of repair, service and maintenance for these items was paid out of the parties' joint account for so long as it existed. The items were used in the parties' joint cattle operation and were claimed as assets on the depreciation schedule filed with their joint income tax returns.

As for the cattle, the court determined that even if Steve's original cows were gifted to him,

[f]rom the moment the parties were married the cattle operation was funded through the parties' joint checking account, the same account into which Juli deposited all of her paychecks and all of her child support payments. Promptly after their marriage, Steve and Juli set into motion a very intentional plan to grow the cattle herd. The real estate was acquired and substantially improved with joint monies as described above to allow for the growth of the cattle herd. Bulls were purchased. Calves were held back, fed, cared for and bred. Juli was an active participant in these decisions and in the care of the herd. Feed, hay, feeders and waterers were purchased with monies from the parties' joint bank account. Veterinarian bills were paid from the parties' joint bank account. Machinery and equipment used in the cattle operation was purchased, serviced, maintained and insured with monies from the parties' joint bank account. It is unlikely that many, if not all, of Steve's original 25 head of cows are even still part of the herd. Under these circumstances, it would be inequitable to set aside 25 head of cows as Steve's separate property.

With respect to Steve's claim that the 2011 Kawasaki Mule should not be considered marital property because it had been given to his mother and was kept at his mother's residence, the court found:

Steve and Juli purchased and paid for the 2011 Mule during the marriage. Steve continued to list the 2011 Mule on his bank financial statements after August 2013. The 2011 Mule remained a listed asset on Steve and Juli's income tax return depreciation schedules for all years since 2011, including on Steve's individual return for tax year 2015. The 2011 Mule remained a listed item on Steve and Juli's insurance coverage, including on the individual policy Steve acquired in January 2016. While it is undisputed that Steve's mother has been allowed to use the Mule and it has remained at her residence, its actual ownership has not been transferred. It remains an asset of the parties for purposes of these proceedings.

The district court did set aside some items to Steve as gifted property, i.e., a 1997 Buick LeSabre, a 1980 Chevrolet pickup, and a boat. The court divided the marital property and debts, awarded Juli fifty percent of Steve's pension fund accrued during the parties' marriage, assigned vehicles to each party, awarded Steve the cows, the pastureland, and the farm machinery, and ordered Steve to

pay Juli an equalization payment in the amount of $149,439.50. The court restored Juli's surname and she is now known as Julianne Ireland.

Steve appeals and Juli cross-appeals.

## II. Scope and Standard of Review.

Dissolutions of marriage are tried in equity and appellate review is de novo. *In re Marriage of McDermott*, 827 N.W.2d 671, 676 (Iowa 2013). "[W]e examine the entire record and adjudicate anew the issue of the property distribution." *Id.* "We give weight to the findings of the district court, particularly concerning the credibility of witnesses; however, those findings are not binding upon us." *Id.* Generally, we will disturb the trial court's ruling only when there has been a failure to do equity. *Id.*

## III. Discussion.

### A. Divisible property.

"Iowa is an equitable distribution state." *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). "This 'means that courts divide the property of the parties at the time of divorce, except any property excluded from the divisible estate as separate property, in an equitable manner in light of the particular circumstances of the parties.'" *Id.* (citation omitted). Steve contends much of the property deemed divisible by the district court should have been excluded as premarital or gifted property.

The dissolution court must identify and value all the assets subject to division. *McDermott*, 827 N.W.2d at 676. "To identify divisible property, the district court looks for all marital assets that exist at the time of the divorce, with the exception of gifts and inheritances to one spouse." *Id.* Yet, premarital and gifted

property *may* be included in the divisible estate. *See* Iowa Code §§ 598.21(5)(b), .21(6) (2015). The factors relevant to a court in making an equitable division include:

> (a) The length of the marriage.
> (b) *The property brought to the marriage by each party.*
> (c) The contribution of each party to the marriage, giving appropriate economic value to each party's contribution in homemaking and child care services.
> (d) The age and physical and emotional health of the parties.
> (e) The contribution by one party to the education, training, or increased earning power of the other.
> (f) The earning capacity of each party, including educational background, training, employment skills, work experience, length of absence from the job market, custodial responsibilities for children, and the time and expense necessary to acquire sufficient education or training to enable the party to become self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage.
> . . . .
> (i) Other economic circumstances of each party, including pension benefits, vested or unvested. Future interests may be considered, but expectancies or interests arising from inherited or gifted property created under a will or other instrument under which the trustee, trustor, trust protector, or owner has the power to remove the party in question as a beneficiary, shall not be considered.
> (j) The tax consequences to each party.
> . . . .
> (m) *Other factors the court may determine to be relevant in an individual case.*

*Id.* § 598.21(5) (emphasis added).

We also consider section 598.21(6), which provides:

> Property inherited by either party or gifts received by either party prior to or during the course of the marriage is the property of that party and is not subject to a property division under this section *except upon a finding that refusal to divide the property is inequitable to the other party* or to the children of the marriage.

(Emphasis added.) Thus, our supreme court has recognized the code considers property brought into the marriage by one party is but one factor to consider. *McDermott*, 827 N.W.2d at 671. The following factors are also to be considered:

> (1) contributions of the parties toward the property, its care, preservation or improvement[ ];
> (2) the existence of any independent close relationship between the donor or testator and the spouse of the one to whom the property was given or devised;
> (3) separate contributions by the parties to their economic welfare to whatever extent those contributions preserve the property for either of them;
> (4) any special needs of either party;
> (5) any other matter[,] which would render it plainly unfair to a spouse or child to have the property set aside for the exclusive enjoyment of the donee or devisee.

*Id.* at 679 (alterations in original) (citation omitted). It is the court's obligation to achieve an equitable division of assets after considering all the pertinent factors. *See id.*; *see also In re Marriage of Muelhaupt*, 439 N.W.2d 656, 659 (Iowa 1989).

### (*1) Gifted monies.*

Steve complains the thirty-six acres of pastureland and farm equipment were gifts from his mother to him alone and the district court should not have included them as marital assets. He stresses the marriage was of short duration. Upon our de novo review, we find no reason to modify the trial court's determination of the marital estate.

We begin our analysis by noting the district court—on several occasions—stated there was not "credible" evidence supporting Steve's claims. Here, the court found, "The only asset for which credible evidence was presented of monies being gifted to provide for the purchase of it is the real estate owned by Steve and Juli." The court continued, however, "Even so, it is not clear those monies were gifted

only to Steve . . . ."  This district relied upon Jo Agan's testimony on cross-examination:

> Q. And you have been asked to look at documentation regarding money you gave Steve for the rake and the mower and the hay processer.  Is there any documentation of the money you say you gave him for the aerator?  A. I have a check—I mean, it went through the bank.
> Q. And the reason I ask is we've seen some other documents in this case that he borrowed money from—for that.  But is it your you testimony you gave—  A. I gave some—I gave part of it—partial, whatever.
> Q. And now how Steve handled the monies that you provided him, what accounts he put it in, and what he did with it from there was up to him.  Would that be true?  A. Yes.
> Q. Do you have a strained relationship with Juli?  A. No.
> Q. Did you have any animosity toward her at the time that you provided money to Steve—  A. No —
> Q. —during their marriage?  A. —no.
> Q. And would you have any concern if he would have put the money that you gave her into their joint accounts?  A. No. I trusted him to do with it—
> Q. What he wanted —  A. . . . what the purpose was for, whatever it was for.
> Q. And to do it whatever he saw fit?  A. Yes.
> Q. Would you have strictly forbidden him from Juli having any benefit off of any of the monies you provided him?  A. No.
> Q. And would that sentiment hold true both at the time that you gave the monies and today?  A. Yes.

Further, with respect to all other items Steve claimed were purchased from money gifted only to him, the court found "no credible evidence exists for the court to conclude they were purchased with gifted monies.  Steve's testimony to that fact is not credible."  The court noted there were no gift tax returns filed and many of the items Steve claims to be his alone are insured by the parties' policies and listed on the parties' tax returns.

However, the district court made no credibility findings with respect to the testimony of Jo Agan or Juli.  We find Jo Agan's testimony consistent with Steve's

of testimony that although Steve could use the money for whatever he saw fit—including benefiting Juli—the gifts of monies were to Steve. In fact, most of the monies gifted to Steve were for a specific purpose—to purchase pasture land or buy specific pieces of farm equipment. When Jo Agan was asked whether the more than $89,000 gifted for the purchase of the pastureland was a gift to Steve and Juli, she responded, "It was for Steve's cows." She was then asked, "Just Steve?" and she responded, "Yes."

When Juli testified, she acknowledged or did not dispute, Steve's mother provided gifts of money for the hay mower, hay rake, hay processor, new mule, and $80,000 towards the pasture land (though she disputed an additional $9058 used for the land purchase).

Because the district court is in a unique position to hear the evidence and observe the witnesses' demeanor, we generally defer to the district court's determinations of credibility. *In re Marriage of Brown*, 487 N.W.2d 331, 332 (Iowa 1992). We decline to defer in this instance, however, in light of the supporting testimony of Jo Agan, as well as Juli's, that Jo Agan did in fact make monetary gifts.

We must next consider whether the gifts of monies were to Steve alone or to both Steve and Juli. To determine if a gift was made to one or both parties, we consider (1) the intent of the donor and (2) the circumstances surrounding the gift. *In re Marriage of Wertz*, 492 N.W.2d 711, 714 (Iowa Ct. App. 1992).

Here, we acknowledge no gift tax returns were apparently filed. We also acknowledge Juli had a good relationship with Jo Agan and Jo Agan would have had no complaints if some or all of the monies were used for Juli's benefit.

Nonetheless, the gifts of monies were intended to help finance the purchase of the pastureland and various pieces of farm equipment for the cattle and farm operations and were used for that purpose. Jo Agan's testimony clearly reflects her intent was to gift the monies to Steve alone, for these specific purposes. The fact that gifted monies provided to Steve were commingled into a joint account does not serve to transform the gifted property to marital property. *See id.* at 713-14.

Our analysis does not yet end because property purchased with the gifted monies may be divided if it is inequitable to refuse to divide it. *See* Iowa Code § 598.21(6). In determining if it would be inequitable *not* to divide the gifted monies, we consider the following factors:

> "(1) contributions of the parties toward the property, its care, preservation or improvement[ ];
> (2) the existence of any independent close relationship between the donor or testator and the spouse of the one to whom the property was given or devised;
> (3) separate contributions by the parties to their economic welfare to whatever extent those contributions preserve the property for either of them;
> (4) any special needs of either party;
> (5) any other matter which would render it plainly unfair to a spouse or child to have the property set aside for the exclusive enjoyment of the donee or devisee."

*In re Marriage of Goodwin*, 606 N.W.2d 315, 319 (Iowa 2000) (quoting *In re Marriage of Thomas*, 319 N.W.2d 209, 211 (Iowa 1982)). In *Thomas*, the court also stated,

> Other matters, such as the length of the marriage or the length of time the property was held after it was devised or given, though not independent factors, may indirectly bear on the question for their effect on the listed factors. Still other matters might tend to negative or mitigate against the appropriateness of dividing the property under a claim that it falls within the exception.

319 N.W.2d at 211. In *Goodwin*, the court added, "[W]here the parties have enjoyed, over a lengthy period of time, a substantial rise in their standard of living as the result of gifts or inheritances, then any division of property should enable the parties to continue that lifestyle, even if that goal requires the division of gifted property." 606 N.W.2d at 319 (citing *Muelhaupt*, 439 N.W.2d at 659).

Considering all pertinent factors, in *In re Marriage of Geil*, a farm inherited by the wife was divided equally because the farm had served as the family homestead and provided the family's livelihood for many years. 509 N.W.2d 738, 741 (Iowa 1993). The court found the farm and its substantial debt were "inextricably bound" and both parties should be responsible for the debt. *Id.*

Here, the parties had a short-term marriage of about seven years. We agree with Steve the equity in the land should not be divided equally simply because the deed to the land reflected both of their names. *See In re Marriage of Liebich*, 547 N.W.2d 844, 851 (Iowa Ct. App. 1996) (observing the act of placing gifts received by one spouse into joint ownership is not a conclusive factor in deciding whether the property should be divided as a marital asset). Juli was actively involved in the cattle operation for the first two years. After the pastureland was purchased, extensive improvements were made to the land. These improvements were financed from a joint account to which both parties contributed. Five years after the purchase and the improvements were completed the pasture land had increased in value from about $89,000 to $125,000. We also note Juli had a good relationship with Jo Agan and Jo Agan was not opposed to Juli receiving a benefit from her gifts. Accordingly, we conclude that although the

pastureland was purchased from gifted monies from Jo Agan to Steve, Juli should be awarded one-fourth of its value ($125,000 ÷ 4 = $31,250). The failure to recognize her contributions to the cattle operations upon the pastureland, her financial contributions to the improvements to the land, and her contributions to the family by providing her a portion of the pastureland would be inequitable. However, the hay processor, hay mower, hay rake, and Kawasaki ATV shall be aside to Steve as gifted property. In addition, one-half of the value of the roller/aerator ($8000 ÷ 2 = $4000) shall be set aside as gifted property as one-half of the monies expended to purchase it. This equipment provided no direct benefit to the parties' lifestyle.

Steve was also gifted a boat and a 1998 Dodge Dakota from his father during the marriage. Juli makes no claim for the boat, and it should be awarded to Steve as gifted property. Contrary to the district court, we also conclude the 1998 Dodge Dakota should be set aside as gifted property.

### (2) Premarital property.

Prior to marriage Steve owned a 1980 Chevy pickup, Grasshopper lawnmower, Mahenda tractor, and a 1560 International tractor. The lawnmower has since been traded but the other assets remain. Steve also owned a cow herd, which at the time of marriage consisted of thirty-five cows, two bulls, and thirteen calves. The cow herd began with a gift of twenty cows from his grandfather in 2000 and 2001.

We discussed the award of premarital property in *In re Marriage of Hansen*, 886 N.W.2d 868, 872-73 (Iowa Ct. App. 2016), noting, "We have stated that the claim of a party to the premarital property owned by the other spouse in a short-

term marriage is 'minimal at best.'" (Citing *In re Marriage of Dean*, 642 N.W.2d 321, 326 (Iowa Ct. App. 2002) (one year); *In re Marriage of Peiffer*, No. 12–1746, 2013 WL 5498153, at *3 (Iowa Ct. App. Oct. 2, 2013) (seven years)). We also observed in *Hansen*, "[I]t is often equitable to simply award the property to the party that brought it into the marriage." 886 N.W.2d at 873 (citing *In re Marriage of Steenhoek*, 305 N.W.2d 448, 453-54 (Iowa 1981) (ordering property returned to husband in five-year marriage); *In re Marriage of Wallace*, 315 N.W.2d 827, 830-31 (Iowa Ct. App. 1981) (noting length of marriage can be a major factor in determining each parties' rights)).

Because the parties' marriage was short-term, less than seven years, Juli's claims to any of these assets are minimal at best. The farm equipment was used in Steve's cattle and farm operations. Steve's claim to the cow herd is also bolstered by the fact that the herd originated by gifts from his grandfather. We conclude the farm equipment should be awarded to Steve in its entirety as his premarital property. We note Steve reported on a personal financial statement for the Union State Bank, dated the same month the parties were married, that his cattle herd had a total value of $33,650. The cattle operation has since expanded. Appreciation in the value of assets during the marriage is a marital asset. *See In re Marriage of White*, 537 N.W.2d 744, 746 (Iowa 1995) (concluding appreciation in the value of assets during the marriage is a marital property). Juli should be awarded one-half of the increase in value of the cattle herd at the time of the dissolution trial. Absent some clear recordkeeping of the herd, we reject Steve's claim that he should be awarded the entire herd because all the cattle originated from his grandfather's gift. Even if we accepted Steve's argument, appreciation in

the cattle operation is generally considered marital property—particularly when the record reflects Juli did assist in the cattle operations to some degree.

### B. Valuation.

Steve next contends the court should not have considered Juli's testimony concerning the value of the acreage and farm equipment. He notes Juli's appraiser did not timely submit valuations. He argues the court erred in allowing Juli to testify as to the value of the property.

"We review evidentiary rulings for an abuse of discretion. A district court abuses its discretion when it bases its decisions on grounds or reasons clearly untenable or to an extent that is clearly unreasonable." *Stender v. Blessum*, 897 N.W.2d 491, 501 (Iowa 2017) (citations omitted).

"In ascertaining the value of property, its owner is a competent witness to testify to its market value." *In re Marriage of Hansen*, 733 N.W.2d 683, 703 (Iowa 2006). Here, when the court excluded evidence from Juli's appraiser, Juli testified she researched comparable properties on the internet. She also testified she was involved in the acquisition of the machinery and equipment and used many of the same websites they had relied upon when they were purchasing the items. Moreover, Steve acknowledged he used the same website, tractorhouse.com, to help him determine his values. We find no abuse of discretion by the trial court in allowing Juli to testify on the value of the property.

In relation to Juli's use of websites, Steve argues the court erred in admitting, over his objection, about forty pages of notes containing information from the websites as well as Juli's handwritten notes. Steve adds that the district

court then relied heavily upon those forty pages of notes to arrive at the values for the farm equipment.

Initially, Juli's counsel asked permission for Juli to use the forty pages of notes to aid her testimony. Steve's counsel objected and argued that he could not "look those over and then properly cross-examine over [forty] pages of notes that I am just receiving." The objection was overruled and Juli was permitted to use her notes. Later, Juli's counsel asked that her forty pages of notes, Exhibit TT, be admitted into evidence. Steve's counsel responded, "Just same objection, Your Honor, I made previously, I didn't see it until today."

Steve now argues Juli failed to comply with the trial scheduling order in failing to provide a copy of the notes in advance of trial and also failed to supplement her answer to Interrogatory 10 setting forth all assets over $500 in value that she claimed an interest. However, we conclude Steve failed to preserve error on these arguments. *See* Iowa R. Evid. 5.103(a)(1)(B) (providing that to preserve error on an evidentiary claim, a party must timely object and "state the specific ground" for the objection). Steve did object to some exhibits on the grounds he now raises, but no objection was made to Exhibit TT—Juli's forty pages of notes on those same grounds. With respect to Exhibit TT, the objection did not refer to either the trial scheduling order or Interrogatory 10 and thus failed to alert the district court of the basis now urged.[17] *See State v. Howard*, 509 N.W.2d 764, 769 (Iowa 1993).

---

[17] We acknowledge the district court could have delayed the cross-examination of Juli until Steve's counsel had sufficient time to review the notes, but we observe there was a lunch hour allowing some time to review the notes during the trial, and notwithstanding the short time, counsel thoroughly cross-examined Juli on her values. We also acknowledge

Even if we consider counsel's objection sufficient to raise the issues he now raises, we conclude there was no abuse of discretion in overruling Steve's objection. Juli's answer to interrogatory 25 stated, in part, that she was claiming fifty percent of the various pieces of machinery and equipment that had been purchased. Steve did not file a motion to compel a more definitive answer to interrogatory 10 in light of Juli's answer to interrogatory 25, even though he filed a motion to compel related to other issues. The complaint now is that the district court gave too much weight to the exhibit. However, the court's reliance on the exhibit likely can be explained by the failure of either party to complete an appraisal of the equipment. Moreover, counsel sought no delay in the trial to review the documentation, and the documentation was cumulative to Juli's testimony. *See Vasconez v. Mills*, 651 N.W.2d 48, 57 (Iowa 2002) (concluding there was no prejudice in erroneously admitting hearsay when it is merely cumulative to other evidence in the record).

Steve also complains the trial court's equipment valuations are all too high. However, the court found Steve's claims that some of the property was damaged or in need of repair was not credible and we defer to these credibility findings. On cross-appeal, Juli asserts the court's valuation of the pastureland was too low. We reject both parties' complaints. We will generally defer to the district court's determinations of property value so long as they are within the range of evidence presented at trial. *Hansen*, 733 N.W.2d at 703. Upon our de novo review and as

---

Steve's counsel had earlier objected to some evidence on the bases of the trial scheduling order and Juli's answer to interrogatory 10.

already discussed in this decision, we conclude the valuation of the pastureland and various pieces of farm machinery fell within the range of the parties' evidence.

### C. Equalization payment.

Steve asserts the district court failed to specify how it derived the value of the equalization payment and argues the amount ordered ($149,139.50) is unreasonable. However, as pointed out by Juli, Steve completely omits any mention of the cattle herd.

Though the court does not specifically state the value of the herd, we note the district court awarded the entire cattle herd to Steve. Steve testified he had forty-five cows,[18] twenty-five of which should be considered premarital. The court determined it would be inequitable to set off any of the "first" twenty-five head of cows to Steve, noting the parties' "intentional plan to grow the cattle herd" and cattle operation, Juli's active participation in the operation, and the use of the joint bank account to purchase, service, and maintain the operation. Steve agreed the two bulls he now owns should be considered marital property. He also testified he had one calf. Steve testified the value of each cow was $1082, the value of the calf was $300, and each bull had a value of $1500. Thus, Steve's own testimony is that the cattle herd had a value of $51,990.[19]

Juli claims the cattle should be part of the marital property and the district court reached the same conclusion. However, it does not appear the cattle were included in the court's calculations in determining the equalization payment. Thus,

---

[18] Steve stated one cow had died the night before trial.
[19] (45 x $1082)+(2 x $1500)+$300=$48,690+$3000+$300=$51,990. Steve also sold cattle during the parties' separation and kept the $38,000 in proceeds but the $38,000 in proceeds were considered in the court's equalization payment

Juli claims the equalization payment should be increased to $152,413.50 to account for the cattle.[20]

Steve asserts the decree found the total value of assets subject to division is $368,663 and the total value of liabilities subject to division is $146,248. But Steve omits any value for cattle still on hand from his calculation of the net proceeds awarded to him. Including the cattle herd value of $51,900, our review of the decree awards Steve $396,988 in assets and $109,872 in liabilities for a net of $287,116. The decree awarded to Juli $23,576 in assets and $36,376 in liabilities for a net of ($12,800).

With respect to the cattle herd, as we indicated earlier, Steve should be afforded a credit of $33,650 (for the value of the herd as premarital property and further supported by the original gift of twenty cows from his grandfather). The difference between the value of the cow herd at the time of trial, less this credit, should be divided equally between the parties as appreciation arising during the marriage ($51,900 – $33,650 = $18,250; $9125 to each party).

In sum, and upon our de novo review of the decree, we do not modify the distribution of property except the equalization award. Both parties agree Juli was awarded total assets of $23,576 and assigned liabilities in the sum of $36,376 for a net value of -$12,800. Both parties also agree that Steve was assigned liabilities in the amount of $109,872. There is also no dispute with respect to the "separate property" identified in the decree awarded to Steve as his premarital property. The

---

[20] Juli claims when the cattle are added to the other assets awarded to Steve, he received net assets of $292,027.00 and she received net assets of -$12,800.

parties part ways, however, on the total value of the assets awarded to Steve and the equalization payment to Juli.

We have concluded Juli should be awarded one-fourth of the value of the pastureland ($31,250) and one-half of the increase in value of the cow herd ($9125). Steve should be awarded certain farm equipment because the equipment was purchased by gifted monies—hay mower, hay rake, hay processor, Kawasaki ATV, and one-half of the value of the roller/aerator ($4000). Steve should also be awarded the 1998 Dodge Dakota as separate gifted property.

The decree also awarded Steve the remaining farm equipment,[21] which need not be repeated here; along with other equipment (identified as feeders, waterers, fencing, and tools) totaling $4500; one-half of the value of the roller/aerator ($4000); his bank accounts; withdrawals taken by Steve in the sum of $10,000; and livestock sale proceeds of $38,477. The total sum of these assets is $195,439.

If we total the sum of $195,439 with Steve's share of the pastureland, $93,750 and his share of the appreciation in the cattle herd of $9125, the total assets received by Steve is $298,314. His share of the liabilities is $109,872 and the value of his net assets is $188,442. The net value of assets awarded to Juli in the decree is -$12,800 plus $31,250 for the pastureland and $9125 for the appreciation of the cattle herd for a total of $27,575. The difference between $188,442 and $27,575 is $160,867. Juli should be awarded an equalization payment of one-half of $160,867—or approximately $80,000. We feel this sum is

---

[21] These items are listed in the decree as seventeen separate items of marital property of which we have excluded the items we identified as gifted property.

generous in light of the parties' contributions and the fact this was a short-term marriage where it is often unnecessary to order an equalization payment. *See Hansen*, 886 N.W.2d at 873 (concluding "to achieve equity, the division need not be equal in most short-term marriages"). We modify the decree accordingly.

**IV. Appellate Attorney Fees.**

"Appellate attorney fees are not a matter of right, but rather rest in this court's discretion." *In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005). "In determining whether to award appellate attorney fees, we consider the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal." *McDermott*, 827 N.W.2d at 687 (internal quotation marks and citations omitted). Having considered these factors, we decline to award Steve attorney fees.

**V. Conclusion**.

We modify the dissolution decree to account for various gifted monies and conclude the equalization payment to Juli from Steve shall be in the amount of $80,000.

**AFFIRMED AS MODIFIED.**